**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIM. NO. 25-217** |
| **FRANK SANTUCCI, SR.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Frank Santucci, Sr., was an owner of multiple Santucci's Original Square Pizza Restaurants, a popular chain of pizza restaurants specializing in square pizzas. The defendant also took a leading role in operating these businesses. In this role, he repeatedly provided the businesses' tax return preparers with false and misleading information that understated the businesses' gross receipts and omitted the significant cash payroll that the businesses paid to their employees. He also kept a second set of books and deposited cash receipts into bank accounts that he hid from the tax return preparers. As a result of this pattern of fraudulent conduct, these businesses filed false tax returns for 2015 through 2018 that substantially understated their income by approximately $5 million.

The falsification of these corporate tax returns had a predictable effect: the owners of these businesses reported less income from the businesses, causing them to report significantly less income than they should have and, thus, report less taxes due to the United States for these years. One of the primary beneficiaries of this falsification was defendant Santucci himself. The falsification, however, also substantially benefitted the other owners of the businesses, who included the defendant's daughter, her husband, and other family members.

1

Overall, for tax years 2015 through 2018, defendant Santucci caused the Santucci pizza businesses to underreport over $4.8 million of income to the IRS. This resulted in the defendant himself evading $374,944 in taxes (a figure about which there is no dispute). In addition, the defendant's fraud caused his co-owners to pay approximately $700,000 less in taxes than they should have. Because this tax loss was reasonably foreseeable to the defendant and part of his common plan, the government requests that the Court find that this tax loss is relevant conduct for guidelines purposes. Finally, the defendant's regular practice of omitting cash wages from the businesses' tax returns resulted in the non-payment of approximately $300,000 in employment taxes. The government also urges the Court to find that this tax loss is relevant conduct.

Accordingly, in total, over a four-year period, defendant Santucci caused his family's pizza businesses to underreport almost $5 million in gross receipts. As a direct result of this conduct, not only did he evade almost $400,000 in personal taxes, but his family members did not report or pay approximately $700,000 in taxes. Combined with the payroll taxes that were evaded as a result of his conduct, the defendant caused a total tax loss to the IRS of approximately $1,350,000. As explained below, all of this loss to the U.S. taxpayers should be considered when calculating the defendant's total tax loss and imposing the appropriate sentence upon him.

As this Court is well aware, a sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025). At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the

prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.    FACTUAL BACKGROUND

The Santucci family has owned and operated pizza restaurants in Philadelphia for at least half a century. In or around 1976, the defendant took over the family business, and since then, he has expanded the business by opening other locations, including the three Santucci's Pizza locations (collectively, "Santucci's Pizza Restaurants") that are the focus of this case:

- ABF Pizza Inc. ("ABF Pizza"), d/b/a Santucci's Original Square Pizza, located on 10th Street in Philadelphia, Pennsylvania, which opened in or around 2010;

- North Broad Pizza Inc. ("North Broad Pizza"), d/b/a Santucci's Original Square Pizza, located on North Broad Street in Philadelphia, Pennsylvania, which opened in or around 2015; and

- Ridge Pizza Inc. ("Ridge Pizza"), d/b/a Santucci's Original Square Pizza, located on Ridge Ave in Philadelphia, Pennsylvania, which opened in or around 2017.

Each of these Santucci's Pizza Restaurant locations operated through S Corporations, meaning corporations whose income flowed through the companies to their shareholders and was not taxed at the corporate level. Because these corporations elected to be treated as S Corporations, their shareholders were then each responsible for reporting their share of the income from these companies and paying taxes on this income. As of 2019, the defendant was a 50% shareholder of ABF Pizza, a 12.5% shareholder of North Broad Pizza, and a 10% shareholder of Ridge Pizza. The other shareholders included the defendant's family members and an associate of the defendant.

Defendant Santucci and his co-owners operated the Santucci's Pizza Restaurants largely as "cash only" businesses, except that they accepted bank cards for catering orders. The

Santucci's Pizza Restaurants posted signs that read "Cash Only." This business practice facilitated the evasion of income and employment taxes.

From at least 2015 through 2019, the defendant held informal bookkeeping responsibilities for the finances of the Santucci's Pizza Restaurants. In this role, he had access to information relating to all sales (both cash and non-cash sales), cost of goods sold, operating expenses, equipment and machinery expenses, insurance, payroll, shareholder distribution information, and other general ledger records for the Santucci's Pizza Restaurants. The defendant was also an authorized accountholder of, as well as an authorized sole signatory of checks drawn on, the following bank accounts used to conduct business on behalf of the Santucci's Pizza Restaurants: PNC Bank account ending 2635, in the name of ABF Pizza, Inc. dba Santucci's Original Square Pizza; Univest Bank and Trust Co. account ending 0208, in the name of North Broad Pizza Inc. dba Santucci's Pizza; and United Savings Bank account ending 0775, in the name of Ridge Pizza Inc. dba Santuccis (collectively, the "Santucci's Business Bank Accounts").

A. **Tax Year 2017 (Counts One and Three)**

For tax year 2017, the defendant used the services of Tax Preparer 1, who was based in New Jersey, to prepare tax returns and forms for the S Corporations that ran the Santucci's Pizza Restaurants and for himself. The defendant had previously used Tax Preparer 1 to prepare tax returns for himself and these businesses.

The defendant provided Tax Preparer 1 with records reflecting, among other things, information for the Santucci's Pizza Restaurants relating to earnings, payroll, cost of goods sold and other expenses, and net income, a detailed general ledger, and copies and summaries of bank statements from each of the Santucci's Business Bank Accounts, with the knowledge that Tax Preparer 1 would rely on these records to prepare tax returns and forms.

Significantly, the defendant concealed from Tax Preparer 1 the totality of cash sales for the Santucci's Pizza Restaurants in 2017 by depositing the businesses' cash receipts into bank accounts other than the Santucci's Business Bank Accounts, and not informing Tax Preparer 1 of these deposits and not providing Tax Preparer 1 with any information relating to these other accounts, which included PNC Bank account ending 7748, a bank account held jointly by the defendant and another shareholder of the Santucci's Pizza Restaurants. These deposits were made at weekly and monthly intervals, and each deposit amounted to thousands of dollars.

Also, while performing bookkeeping for the Santucci's Pizza Restaurants, the defendant maintained in his home office two sets of financial records relating to the finances of North Broad Pizza. The first set reflected earnings, payroll, and expenses for North Broad Pizza from January 2016 through December 2018 that were provided to the restaurants' tax accountant (Tax Preparer 1). The second set of books reflected weekly cash earnings for North Broad Pizza from October 12, 2015, through January 30, 2017, which the defendant concealed from Tax Preparer 1. The earnings reflected in the second set of books were significantly higher.

As a result of the partial information that the defendant provided to Tax Preparer 1, Tax Preparer 1 prepared tax returns for the Santucci's Pizza Restaurants that understated the restaurants' gross receipts and income for 2017, and thereby understated the flow-through income to the owners of the restaurants, including the defendant. Also in or about April 2018, the defendant caused Tax Preparer 1 to file false and fraudulent 2017 Forms 1120S (that is, corporate income tax returns) for the Santucci's Pizza Restaurants with the IRS, despite knowing that they underreported, among other things, the restaurants' gross receipts, income, and flow-through income for their owners.

Using this understated flow-through income, Tax Preparer 1 prepared a U.S. Individual Income Tax Return, Form 1040, for the defendant and his wife for 2017. The defendant made and subscribed to this tax return, as verified by a written declaration that it was made under the penalty of perjury. Because the flow-through income was understated, the Form 1040 for 2017 understated the defendant's total income and tax liability. Specifically, the defendant's Form 1040 reported that the defendant's S Corporation income was $46,893, when in reality, it was $314,325. Despite knowing that his 2017 Form 1040 understated his income and his tax liability, the defendant caused Tax Preparer 1 to file the false and fraudulent 2017 Form 1040 for the defendant and his wife with the IRS on or about April 10, 2018.

**B.      Tax Year 2018 (Counts Two and Four)**

For tax year 2018, the defendant used the services of a different tax accountant ("Tax Preparer 2"), who was also based in New Jersey, to prepare tax returns and forms for the Santucci's Pizza Restaurants and the defendant himself. The defendant provided Tax Preparer 2 with records reflecting, among other things, information for the Santucci's Pizza Restaurants relating to earnings, payroll, cost of goods sold and other expenses, and net income, a detailed general ledger, and copies and summaries of bank statements from each of the Santucci's Business Bank Accounts, with the knowledge that Tax Preparer 2 would rely on these records to prepare tax returns and forms.

The defendant concealed from Tax Preparer 2 the entirety of cash sales for the Santucci's Pizza Restaurants by depositing cash receipts into bank accounts other than the Santucci's Business Bank Accounts and not informing Tax Preparer 2 of these deposits and not providing Tax Preparer 2 with information relating to these other accounts, which included PNC Bank account ending 7748.

6

As a result of the partial information that the defendant provided to Tax Preparer 2, this accountant prepared tax returns for the Santucci's Pizza Restaurants that understated the restaurants' gross receipts and income for 2018, and thereby understated the flow-through income to the owners of the restaurants, including the defendant. As a result, the defendant caused Tax Preparer 2 to file the false and fraudulent 2018 Forms 1120S for the Santucci's Pizza Restaurants with the IRS in April 2019, despite knowing that they underreported, among other things, the restaurants' gross receipts, income, and flow-through income for their owners.

Using this understated flow-through income, Tax Preparer 2 prepared a U.S. Individual Income Tax Return, Form 1040, for the defendant and his wife for 2018. The defendant made and subscribed to this tax return, as verified by a written declaration that it was made under the penalty of perjury. Because the flow-through income was understated, the Form 1040 for 2018 understated the defendant's total income and tax liability. Specifically, the defendant's Form 1040 reported that the defendant's S Corporation income was $142,580, when in reality, it was $739,897. Despite knowing that his 2018 Form 1040 understated his income and his tax liability, the defendant caused Tax Preparer 2 to file a false and fraudulent 2018 Form 1040 for the defendant and his wife with the IRS in or about April 2019.

### C.    Additional Evidence and Relevant Conduct

#### 1.    Tax Deficiency – Defendant's 1040

As noted above, a result of the defendant's conduct, the Santucci's Pizza Restaurants underreported to the IRS their total earnings for tax years 2015 through 2018 by over $4.8 million. Consequently, for these tax years, the defendant had a personal tax deficiency of $374,944, calculated as follows:

| Frank Santucci, Sr. & AE.S. 1040 Filing | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Filing date | 4/14/2016 | 3/21/2017 | 4/10/2018 | 4/13/2019 |
| Total S corporation income reported to IRS | -- | $6,153 | $46,893 | $142,580 |
| ABF Pizza unreported income | | | $252,253 | $547,251 |
| North Broad Pizza unreported income | $41,635 | $191,616 | $62,072 | $153,596 |
| Ridge Pizza unreported income | | | | $39,050 |
| Tax deficiency per year (how much additional taxes should have been paid, per year) | $4,879 | $43,229 | $95,001 | $231,835 |
| **Total Tax Deficiency** | | | | **$374,944** |

### 2.  Tax Deficiency – Defendant's and Other Shareholders' 1040s

As a result of the defendant's underreporting of earnings for the S Corporations that ran the Santucci's Pizza Restaurants, the flow-through incomes for the other shareholders were also underreported, resulting in substantial amounts that were due and owing to the IRS. Several of these other shareholders used different tax accountants, but each shareholder received a Schedule K-1 from the defendant's tax accountant (either Tax Preparer 1 or Tax Preparer 2, depending on the year) stating the shareholder's portion of the income for tax purposes, based on the false sales figures that the defendant provided to the tax return preparer. These inaccurate Schedule K-1s caused these shareholders to underreport their income and their taxes, as set forth below:

| Shareholder | Tax Deficiency by Tax Year | | | |
|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** |
| F.S. (Defendant) & AE.S. | $4,879 | $43,229 | $95,001.09 | $231,835 |
| A.S. & B.B. | $8,037 | $56,875 | $97,572.76 | $255,910 |
| A.B. | $13,440 | $70,004 | $15,939.00 | $36,513 |
| AY. S. | $2,423 | $20,518 | $13,090.00 | $46,674 |
| F.S.J. | | | | $5,466 |
| M.B. | | | | $40,997 |
| Total tax deficiency by year | $28,779 | $190,626 | $221,603 | $617,395 |
| **Total Tax Deficiency** | | | | **$1,058,403** |

### 3.  Payroll Taxes Due and Owing

Between 2015 and 2019, the above-referenced shareholders were on the payroll for Santucci's Pizza Restaurants and received their paychecks via direct deposit or physical checks signed by the defendant or another shareholder/manager. Other employees received their

payments via direct deposit, physical checks, or cash. For the people who were on the payroll and received their paychecks via direct deposit or in the form of physical checks, federal taxes were withheld and paid over to the IRS. For the employees who were paid in cash, however, no employment taxes were withheld or paid to the IRS, as required by law. As noted above, the defendant hid these cash payments from the businesses' accountants, and he did not collect or pay over employment taxes for this cash payroll. Thus, he is responsible for the tax loss resulting from this conduct.

The S Corporations that operated the Santucci's Pizza Restaurants were required to report all of their payroll on quarterly employment tax returns, Forms 941, and report the employment taxes on those tax returns. Because defendant Santucci caused employees to be paid in cash and did not report these wages to the businesses' accountants, the Forms 941 for the businesses underreported their wages and employment taxes. IRS Criminal Investigations calculated the *true* payroll, which included the unreported cash payroll, using the accurate sets of bookkeeping records that were maintained by the defendant, but not provided to either Tax Preparer 1 or Tax Preparer 2, and the payroll taxes due, for the years under investigation, as follows:

| Restaurant | 2015 | 2016 | 2017 | 2018 | 2019 | Payroll Taxes Due |
|---|---|---|---|---|---|---|
| ABF Pizza | | | | $46,024.24 | $41,621.04 | $87,645.28 |
| North Broad Pizza | $11,408.60 | $48,569.12 | | $46,472.52 | $58,291.60 | $164,741.84 |
| Ridge Pizza | | | | $24,037.52 | $23,563.24 | $47,600.76 |
| Total | $11,408.60 | $48,569.12 | | $116,534.28 | $123,475.88 | **$299,987.88** |

Because the defendant caused the restaurants' employees to be paid in cash and because he did not report their cash wages to the S Corporations' accountants, he is responsible for the employment tax loss resulting from this conduct.

### 4. Total Tax Deficiency (Tax Loss), Including Relevant Conduct

The total tax deficiency resulting from the defendant's fraudulent conduct includes (1) the total amount due and owing for all shareholders of the Santucci's Pizza Restaurants for tax years 2015 through 2018 (that is, approximately $1,058,403) and (2) the amount due and owing for payroll taxes for tax years 2015 through 2019 (that is, approximately $299,989). This total amount is $1,358,392. As explained further below, the government submits that this total tax deficiency is the tax loss amount that this Court should use to calculate the applicable offense level and Guidelines Range in this case.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentences

The statutory maximum sentence for a violation of 26 U.S.C. § 7201 (willful evasion of assessment) is 5 years' imprisonment, a $250,000 fine, a three-year period of supervised release, and a $100 special assessment.

The statutory maximum sentence for a violation of 26 U.S.C. § 7206(1) (filing a false return) is 3 years' imprisonment, a $250,000 fine, a one-year of supervised release, and a $100 special assessment.

The total maximum is 16 years' imprisonment, a $1,000,000 fine, three years of supervised release, and a $400 special assessment.

B.     **Sentencing Guidelines Calculation**

The Probation Office has correctly calculated the defendant's advisory sentencing

guidelines as follows:

| | |
|---|---|
| Tax loss between $550,000 and $1,500,000 | 20 |
| Acceptance of responsibility | -2 |
| Timely notification of intent to plead guilty | -1 |
| Zero-point offender reduction | -2 |
| Total offense level | 15 |

The defendant is in Criminal History Category I. Guideline level 15, Criminal History Category I

results in an advisory sentencing range of 18 to 24 months' imprisonment.

The defendant, however, objects to the inclusion of any tax loss other than the personal

taxes that he evaded. PSR at 26. Thus, he asserts that the tax loss should only be $374,944. He

contends that the tax loss that his conduct caused in connection with his co-owners' tax returns

are merely "civil tax liabilities" that should be "resolved through a civil audit." This position,

however, misinterprets the principles of "total tax loss" and "relevant conduct."

Application Note 2 to U.S.S.G. § 2T1.1 defines the "Total Tax Loss Attributable to the

Offense." Referring the relevant conduct provision in U.S.S.G. § 1B1.3(a)(2) regarding offenses

that require grouping (like those at issue here),[1] the note explains that "all conduct violating the

tax laws should be considered as part of the same course of conduct or common scheme or plan

unless the evidence demonstrates that the conduct is clearly unrelated." The note that provides

the following non-exhaustive list of examples:

a.     where there was a continuing pattern of violations of the tax laws by the

defendant;

---

[1] This provision relates to acts and omissions that "were part of the same course of conduct or
common scheme or plan as the offense of conviction."

    b.      where the defendant used a consistent method to evade or camouflage income, *e.g.*, backdating documents or using offshore accounts;

    c.      where the violations involved the same or a related series of transactions;

    d.      where the violation in each instance involved a false or inflated claim of a similar deduction or credit; and

    e.      where the violation in each instance involved a failure to report or an understatement of a specific source of income, *e.g.*, interest from savings accounts or income from a particular business activity.

Under these principles, the Court should find that the tax losses related to (i) the defendant's co-owners and (ii) the businesses' employment taxes are part of the total tax loss attributable to the defendant's significant course of fraudulent conduct.

First, the tax deficiencies of the defendant's co-owners (many of whom are his close relatives) are certainly "part of the same course of conduct or common scheme or plan." They resulted directly from the conduct that caused the defendant's own tax deficiencies, that is, the falsification of the S Corporations' tax returns. Indeed, more than one of the examples in Application Note 2 apply to this conduct: there was a continuing pattern of tax violations, these violations involved a consistent method of evading taxes, the falsifications involved the same series of transactions, and the violations were of the same type. Moreover, when defendant Santucci caused the S Corporations to understate their income and, thus, the income flowing through to their shareholders, the defendant understood not only that this would improperly reduce his own taxes, but also that it would improperly reduce the taxes owed by the other business owners. And this is exactly what happened: as the IRS has calculated, the defendant's tax evasion resulted in a cumulative tax deficiency for his co-owners of approximately $700,000.

This inclusion of this loss alone should result in a two-level increase to the defendant's guideline calculation.

The employment tax loss resulting from the defendant's payment of cash wages which he did not report to the businesses' tax return preparer (approximately $300,000) should also be counted as part of the total tax loss attributable to the defendant. These losses resulted from the same plan or scheme—the defendant's decision to conceal information about the pizza businesses from their accountants. It is part of the same pattern of conduct and the same series of transactions.

For these reasons, the defendant's total tax loss should be $1,358,392. As a result, the appropriate guideline range for his conduct is U.S.S.G. § 2T4.1(H) because the total tax loss under the relevant principles is more than $550,000, but not more than $1,500,000, resulting in a base offense level of 20.

## III.    ANALYSIS OF STATUTORY FACTORS

In addition to the Guideline analysis above, this Court must consider the factors set forth in 18 U.S.C. § 3553(a), which include: (1) the nature and circumstances of the offense, and the history and characteristics of defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and protect the public from further crimes of defendant; (4) the need to provide defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the Guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

A.    <u>**The Nature and Circumstances of the Defendant's Offenses**</u>

The defendant's crimes are serious, as they involved the preparation and filing of false corporate and individual income taxes over multiple years. Indeed, as a result of these false returns, the businesses that the defendant was operating failed to report approximately $5 million in income. As explained above, this fraud resulted in the evasion of about $1 million of personal income taxes. A significant portion of these losses ($374,944) inured directly to the defendant's benefit. The rest benefited his family members and another co-owner of the businesses.

Although other owners of the businesses may have had some responsibility for these tax losses, the defendant was clearly the most responsible. He was the one who was performing the businesses' bookkeeping. He was the one maintaining a second set of books. He was the person depositing cash into non-business bank accounts. And he was the one who was providing incomplete records to the tax return preparers.

Furthermore, the evidence has shown that defendant Santucci did not just evade his and his co-owners' individual income taxes. In addition, he caused many of the pizza restaurants' employees to be paid in cash (without withholding taxes) and failed to report these cash wages to the tax return preparers. As a direct result of this, the businesses' employment tax returns did not report these cash wages and appropriate payroll taxes. The additional fraud resulted in another $300,000 of tax loss to the government.

In taking these actions, Santucci deceived the IRS and cheated the taxpayers out of their hard-earned money. Moreover, tax fraud is not just a cost to the treasury; it undermines faith in

the fairness of the administration of the tax system itself. For this reason, the sentencing guidelines calculation provides for a significant sentence of incarceration.

      B.      **Defendant's History and Characteristics**

Santucci was reportedly raised in a loving and close family and provided various opportunities in life. He graduated from high school and soon took over his family's pizza business. Over the years, the defendant grew this business, eventually opening multiple chain locations with his relatives. As a result of his undoubted hard work, he has amassed significant assets, and his current net worth is substantial. This success demonstrates that the defendant's crimes were not committed out of financial necessity, but rather were a product of greed. He deserves credit for his long history of hard work, but such industry does not permit him to cheat the system.

The defendant has suffered from two strokes in the last several years. The government appreciates the significance of these negative health events, but understands that the defendant sought medical attention after the second stroke and is currently taking preventive medication. The defendant's other medical conditions appear to be under control.

      C.      **The Need for the Sentence Imposed To Reflect the Seriousness of the Offenses, To Promote Respect for the Law, and To Provide Just Punishment for the Offenses**

Tax crimes are serious, and the government cannot function without a fair and honest tax system. For this reason, it is important that the sentences in tax cases promote respect for the law by providing just punishment for those who violate criminal tax statutes.

Furthermore, that Santucci is a white-collar offender should not cause the Court to vary downward from the Guidelines range. Courts have explicitly recognized this point:

[N]o 'middle class' sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue

> of being regularly employed or otherwise productively engaged in lawful
> economic activity. It is natural for judges, drawn as they (as we) are from the
> middle or upper-middle class, to sympathize with criminals drawn from the same
> class. But in this instance we must fight our nature. Criminals who have the
> education or training that enables people to make a decent living without resorting
> to crime are more rather than less culpable than their desperately poor and
> deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (internal citation omitted). As a result, Santucci's financial success militates in favor of, rather than against, a period of incarceration.

### D.     The Need for Adequate Deterrence

A Guidelines sentence is appropriate "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The government relies heavily on deterrence to successfully enforce the internal revenue laws—more so than many other statutes. The reason is simple: the number of taxpayers in the United States far exceeds the number of auditors and criminal investigators available at the IRS. Recent figures show that there are approximately 150 million individual income tax returns filed every year, and there are 1.2 million civil IRS audits, but there are only approximately 1,500 criminal prosecutions.[2] Courts have routinely recognized this dynamic, as noted in *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006):

> Because of the limited number of criminal tax prosecutions relative to the
> estimated incidence of such violation, deterring others from violating tax laws is a
> primary consideration underlying these guidelines. Recognition that the sentence
> for a criminal tax case will be commensurate with the gravity of the offense
> should act as a deterrent to would-be violators.

---

[2] *See* IRS, Mid-November filing season statistics by AGI, https://www.irs.gov/uac/Filing-Season-Statistics; Internal Revenue Service Data Book, 2014, at iii, https://www.irs.gov/pub/irs-soi/14databk.pdf; Tax Division, United States Department of Justice, FY 2016 OMB Budget, at 22, http://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/01/9._tax_division_tax.pdf.

*Id.* at 357 (quoting U.S. Sentencing Guidelines Manual ch. 2, pt. T, introductory cmt.).

The size of the U.S. "tax gap"—i.e., the difference between what is owed and what is paid—also makes the need for deterrence clear. The tax gap, which was $90 billion in 1987, has since grown fivefold: to $458 billion, as of the IRS's most recent comprehensive study.[3] This tax gap of almost half a trillion dollars, which has likely increased since the IRS issued its study, is a staggering sum.

The risk of incarceration is both a necessary and powerful deterrent force in white collar cases. Indeed, courts have recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). Furthermore, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*

This case presents an important opportunity for this Court to deter income tax fraud. Many in the restaurant industry are likely to be watching this proceeding, waiting to see what the results of the defendant's egregious tax evasion will be. Indeed, some of those observers are likely members of the defendant's family and his business associates (and may even be members

---

[3]  This IRS study was issued in April 2016 and is based on data from tax years 2008 through 2010. *See* Tax Gap Estimates for Tax Years 2008-2010, at 1, https://www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202 010.pdf. A previous study from 2012, based on data extending through 2006, estimated a tax gap of $450 billion. *See* IRS Releases New Tax Gap Estimates, Rel. No. IR-2012-4 (Jan. 6, 2012), https://www.irs.gov/newsroom/irs-releases-new-tax-gap-estimates-compliance-rates-remain-statistically-unchanged-from-previous-study.

of the audience at sentencing) who will be confronted with similar temptations in the future. A sentence that provides adequate deterrence to this community is important. Without it, business owners, particularly those intentionally operating a cash business, may cynically decide that the benefits of noncompliance outweigh the risks of getting caught and the ensuing punishment, thus contributing to the growing U.S. tax gap.

E.    **The Need To Avoid Disparities**

The Sentencing Commission specifically designed the Guidelines to reduce the number of probationary sentences in tax cases:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced.

U.S.S.G. 2T1.1 cmt. background. This policy determination suggests that a non-Guidelines sentence in this case would not further the goal of reducing disparity in sentencing, and would run contrary to the intent of the Sentencing Commission.

Furthermore, the Guidelines are often the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in creating the Sentencing Commission in the first place. Reference to the Guidelines, while carefully considering the Section 3553(a) factors relevant to an individual defendant, is the only available means of preventing sentencing determinations from varying based on the luck of the judicial draw.

F.    **The Need to Provide Defendant with Treatment**

The government is not aware of a need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

G.    **The Need to Provide Restitution to Any Victims of the Offense**

The defendant's crime resulted in financial loss to the United States government. As explained above, this included not only the $374,944 that the defendant caused in connection with his own taxes, but also the approximately $700,000 that he caused in connection with the taxes of his co-owners of the Santucci's businesses. Although as explained above, the government maintains that the tax losses related to the co-owners should be included as relevant conduct for the purpose of calculating the sentencing guidelines, as part of plea negotiations the parties agreed to limit the restitution owned for criminal purposes to just the $374,944 tax loss attributable to the defendant's own taxes.

Pursuant to the government's motion to permit the prepayment of criminal monetary penalties, the Court granted the defendant the ability to prepay this restitution amount. Thus, defendant Santucci recently submitted a check for $374,944 to the Clerk of the Court. To enable the Clerk to distribute these funds to the IRS, as agreed upon by the parties, the government respectfully requests that the Court order the defendant to make restitution in this amount to the IRS. The government expects that the Clerk will then distribute these funds to the IRS as soon as the Clerk's Office is able, and the restitution obligation will be deemed satisfied (without further payments from the defendant).

IV.    **SUPERVISED RELEASE**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least a year is warranted. As explained above, the defendant committed his tax crimes over multiple years. He caused over $1 million of tax loss to the government. And he remains an owner of the pizza businesses at issue in this case. Thus, supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), and pays restitution to victims, § 3553(a)(7).

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

**V.**   <u>**CONCLUSION**</u>

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney


 /s/ Patrick J. Murray
PATRICK J. MURRAY
Chief, Economic Crimes Section
Assistant United States Attorney

/s/ J. Jeanette Kang
J. JEANETTE KANG
Assistant United States Attorney

Dated: January 5, 2026

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been served by electronic mail upon the following:

Richard Fuschino, Esq.

 /s/ *Patrick J. Murray*
Patrick J. Murray
Assistant United States Attorney

Dated: January 5, 2026